# Sanders *v.* Steele *et al.*

## *Bill to Declare a Resulting Trust.*

1.  *Resulting trust; how it arises.*—A resulting trust arises by operation of law in favor of him who advances the purchase money for land although the title be taken in the name of another; and when two persons together advance the price, and the title is taken in the name of one of them, a trust will result in favor of the other with respect to a share of the property in proportion to the consideration advanced or paid by him.

2.  *Municipal corporations; not the subjects of garnishment.*—Municipal corporations are not the subjects of garnishment in this State. They are held not to be subject to this process, unless, on grounds of public policy, they are included in unequivocal terms by the letter of the statute. Our statute does not include them.

APPEAL from Jefferson Chancery Court.

Heard before Hon. THOMAS COBBS.

The bill in this case was brought by William H. Sanders against Fannie A. Steele and others to establish a trust in certain real estate in the city of Birmingham, and also in a certain decree rendered by the chancery court of Jefferson county in favor of Fannie A. Steele against the mayor and aldermen of Birmingham, on account of damages to said real estate. The case is so fully and clearly stated in the opinion that it is unnecessary to set out the facts here.

CABANISS & WEAKLEY, for appellant.—Where the purchase money is paid by one person, and the title to the property purchased is taken in the name of another, the party taking the title holds it in trust for him who pays the purchase money.—*Foster v. Trustees*, 3 Ala. 302; *Anderson v. Jones*, 10 Ala. 401; *Caple v. McCollum*, 27 Ala. 461; *Bates v. Kelley*, 80 Ala. 142. (2). Where two persons advance the price and the title is taken in the name of one of them, a trust will result in favor of the other with respect to a share of the property proportionate to his share of the price.—*Anthe v. Heide*, 85 Ala. 236; *Bibb v. Hunter*, 79 Ala. 351; *Rhea v. Tucker*, 56 Ala. 450; *Lewis v. Building Association*, 70 Ala. 276.

WHITE & HOWZE, *contra*.—When in the purchase of land the title is taken in the name of one person, and it is claimed that the purchase money was paid by another, the payment must have been made *at the time of the purchase*, and as a part of the original transaction. *Preston v. McMillan*, 58 Ala. 84; *Lehman v. Lewis*, 62 Ala. 129; *Whaley v. Whaley*, 71 Ala. 159; *Tilford v. Torrey*, 53 Ala. 120. (2). There must be something paid at the time, or a promise to pay or do something, that is, there must be a consideration—*Borum v. King*, 37 Ala. 606; *Kennebrew's Case*, 35 Ala. 628; *Crumpton v. Vassar*, 19 Ala. 263. (3). No decree will be rendered in favor of the complainant unless the arrangement is fair and just in all its parts and under all the circumstances. *Hurst v. Thompson*, 73 Ala. 158; *Andrews v. Andrews*, 28 Ala. 432; *Crane v. Dunlap*, 21 N. J. 414; *Greene v. Womack*, 2 Ala. 83; *Blackwilder v. Loveless*, 21 Ala. 371; *Daniel v. Collins*, 57 Ala. 625. Nor in favor one who attempts to speculate on the rise or fall in the value of property.—*Miller v. Hinton*, 51 Pa. St. 265.

HARALSON, J.—The contention of the complainant is, that the trust in question was an express trust, having been declared in writing by Fannie A. Steele, who will be referred to hereafter as the defendant, and signed by her so as to satisfy the requisitions of the statute of frauds; and, further, that it was a resulting trust, by reason of complainant having paid one-half of the

purchase money. The propositions insisted on by complainant's counsel, as stated in their written argument, are, "1. That by the purchase of said property, complainant became entitled to an undivided half interest therein, said Fannie A. Steele being his trustee for the same, and 2nd. That complainant became entitled to an undivided half interest in said property by virtue of having contributed one-half of the purchase money."

Section 1041 of the Code provides, that "No trust concerning lands, except such as results by implication or construction of law, or which may be transferred or extinguished by operation of law, can be created, unless by instrument in writing, signed by the party creating or declaring the same, or his agent or attorney lawfully authorized thereto in writing." This court has several times construed this statute, holding that it is a substantial re-enactment of the 7th and 8th sections of the English statute of frauds, and has the same purpose,— "The requisition of written evidence of trusts concerning lands and the prohibition of the enforcement of such trusts resting merely in parol, when they arise from the agreement of parties, and do not result from the implication or construction of law."—*Bailey v. Irwin,* 72 Ala. 505; *Patton v. Beecher,* 62 Ala. 579. As was said in the case last cited, "All other trusts than such as arise or result by implication or construction of law, are within its operation. Trusts arising or resulting by implication of law may be excluded by, but they do not arise from, nor are they dependent upon the agreement of the parties. From facts proved, without any declaration or agreement of the parties, the law raises the trust. A common case, is when A. purchases lands with the money of B., taking the conveyance of title to himself, the law implies a trust of the title for B."

It is perhaps unnecessary in this case, to discuss the question, whether under the pleadings and proofs, the trust here sought to be set up in favor of complainant, is a trust concerning lands not resulting by implication or construction of law, such as is defined in the section of the Code above quoted. The complaiant insists, that the facts in the case fully establish a trust under that section of the Code, but whether it does or not, can make

no difference since the facts fully establish a trust resulting by implication or construction of law, and we are disposed to review the case as arising under this latter contention.

It is well understood, that a resulting trust arises by operation of law, in favor of him who advances the purchase money for land, though the title be taken in the name of another; and when two or more persons together advance the price, and the title is taken in the name of one of them, a trust will result in favor of the other, with respect to a share of the property, in proportion to the consideration advanced or paid by him.—*Anthe v. Heide*, 85 Ala. 236; *Bates v. Kelly*, 80 Ala. 142; *Lewis v. M. M. B. & L. Asso.*, 70 Ala. 276; 3 Brick. Dig. 785, § § 47, 48.

Mr. Pomeroy defines resulting trusts to be such as "arise when the legal estate is disposed of or acquired, not fraudulently or in the violation of any fiduciary duty, but the intent and theory of equity appears or is inferred or assumed from the terms of the disposition, or from the accompanying facts and circumstances, that the beneficial interest is not to go with the legal title. In such a case a trust "results" in favor of the person for whom the equitable interest is thus assumed to have been intended, and whom equity decrees to be the real owner."—1 Pom. Eq., § 155; 2 Ib., § § 1030-1038; *Lee v. Browder*, 51 Ala. 288; *Lehman v. Lewis*, 62 Ala. 129; *O'Bear Jewelry Co. v. Volfer*, 106 Ala. 205, 215-218. In the case of *Lee v. Browder, supra*, it was said: "The authorities are uniform, and have definitely settled, that the trust of the legal estate, whether it is of freehold or of leasehold, results to him who advances the purchase money, without regard to the person in whose name title is taken. It is said by Judge Story, that the principle has its origin in the natural presumption, in the absence of all rebutting circumstances, that he who supplies the money, means the purchase for his own benefit, rather than that for another; and that the conveyance in the name of the latter is a matter of convenience and arrangement between the parties for some collateral purpose."—2 Story's Eq. 1201. The trust arises by operation or implication of

law, and may be proved by parol, without offending the statute of frauds, which extends to and embraces only trusts created or declared by the parties." In the foregoing authorities there will be found elaborate discussion of resulting and constructive trusts and the distinction between the two, so nearly allied. It may subserve the purpose of this case the better, to refer more particularly to the case of Anthe v. Heide, supra, a case very similar to the one we have before us. Its essential features are the same. A portion of the purchase money of land had been furnished by Mrs. Anthe, and the other portion by Heide. The last payment was made by Heide before it was due without Mrs. Anthe's knowledge or consent. A bond for titles was taken by Heide and transferred to his wife, and on the payment of the purchase money, a conveyance was executed to her by the vendor. She and her husband conveyed the premises by mortgage to Kraus to secure a past due indebtedness. On a bill filed by Anthe and wife against Heide and wife and Kraus, seeking to establish a resulting trust in the land, to the extent of an undivided half interest, as per the terms of an alleged verbal agreement between said Anthe and Heide, to the effect that the purchase had been made on joint account, each paying one-half of the purchase money and acquiring a half interest for their respective wives, the relief prayed was denied and the bill dismissed. On appeal the decree was reversed, and a decree was renderd in this court, declaring complainants to be entitled to the relief prayed. The court said: "If any portion of the money paid to the Elyton Land Company, as a consideration of the purchase of the land, was the money of Mrs. Anthe, as alleged in the bill, although the bond for title was taken by Heide in his own name, a resulting trust would enure to the benefit of Mrs. Anthe, to the extent of the consideration advanced by her. And if Heide himself advanced any part of the consideration by way of a loan to Mrs. Anthe, under an agreement express or implied, he would hold the property upon a resulting trust in her favor, to the extent of her interest in such money consideration, which is alleged in the bill to be an undivided half interest.—*Bates v. Kelly,* 80 Ala. 142, and authorities there cited. * * * * * The last

payment made by Heide, being anticipated by him without the consent or knowledge of the complainants, must in justice and in good conscience be considered as a fraud on the rights of complainants, and an advance by way of an implied loan to Mrs. Anthe to the extent of the difference between what she paid and one half of the entire purchase money, with interest."

From the foregoing principles, it is of easy deduction, that if there was an understanding between complainant and defendant for the purchase on joint account of the First Avenue lot, and, as the undisputed facts show, the same was purchased by defendant, taking a bond for titles from the vendor in her name, and afterwards, when the purchase money was all paid, she received from the seller a conveyance thereof in her own name and the complainant as he insists had furnished his share of the purchase money, and defendant afterwards sold the lot at an advance, then complainant would be entitled to his share of the money received by defendant therefor, and she holds the same in trust for him, for which a court of equity will compel her to account.

The complainant says, that the defendant proposed to him to purchase the property in question on joint account, which proposition he finally agreed to; that there was a running account between him and her, and the payments made by him on account of the purchase price of the property and as appear in said account, were equal to or in excess of those made by defendant, except the last payment made on final settlement in full for the balance due on the purchase price, which balance was made without his knowledge on consent, and which was for his benefit as well as hers. The defendant admitting that she made a proposition to complainant to purchase the property for their joint benefit, says, that he declined the proposition, never agreed to take any interest in the purchase and never made any payment on account thereof. The testimony of the complainant and defendant who are the main witnesses in the case, is in irreconcilable conflict.

In 1878, as it appears, defendant resided with her husband on a farm owned by him in Green county. She continued to reside thereon with her several children,

and carried on the farm, until October, 1882, when she removed to Birmingham. The complainant lived before and since in Mobile, engaged in the practice of medicine. They were brother and sister, and the most cordial and confidential relations, as appears, existed between them. She relied on and trusted him for advice, and he confided in and assisted her in managing her affairs, received and paid out money for her, and often advanced her money to assist her in getting along, when her income or means fell short, at the time, for the purpose. Of all these transactions, so far as it is made to appear, he kept an accurate account and honest memorandum, not in the form a bookkeeper would have kept them, but in such shape as that he and she could have made a correct settlement at any time, and evidently, they expected no trouble or dispute to arise in reference to them, nor, until this litigation commenced, does there appear to have been any trouble about the accounts. She had, among other assets, which she placed in his hands, several one thousand dollar State of Alabama bonds, which he finally sold for her as she required. Sometimes she appears to have been considerably in debt to him, and again he may have owed her, but such credits whether on the one side or the other, were treated as temporary loans without interest.

At the time defendant moved to Birmingham, the spirit of speculation in real estate was rife, and she caught it in no small degree. For the time at least, she met with encouraging success. She wrote many letters to complainant disclosing to him her purposes and schemes, and proposed to make investments in real estate for herself alone, for him alone, and for him and herself on joint account, and she bought on these several accounts. Out of one investment, referred to as the First Avenue property, the litigation on hand grows. He says it was made on their joint account, and she, that she made it alone for herself. She says she never even conferred with him about the purchase of this lot, before she actually purchased it for herself, and could, therefore, have had no prior agreement in reference to its purchase for him and herself jointly. But, in this she is evidently mistaken. In a letter to him, dated the 27th

February, 1883, she says, "This morning I was in town, and my attention was directed to a business lot on the corner of First Ave. and 21st St. It is 50 feet on 1st Ave. and extends back 182½ (feet) to Morris Ave." This answers the description of the lot in question. She added, "There is a big boom just now, and all these lots will soon, perhaps in less time than it will take this letter to reach you, be owned by individuals,—that the terms are not nearly so easy. I should have told you, that there is a great rush for 1st Ave. lots now, and had I the money in hand I would not let the sun go down before the lot was mine."

On April 26th, 1883, she wrote: "Yours received yesterday. Every desirable lot for business or residence is so high that I haven't ventured a purchase yet." That language indicates that he had written to her in reference to a purchase, either on joint or on his individual account. She adds: "I do not intend to buy a lot for myself alone; I cannot see my way clear to do it, as I want to build on my corner lot during the summer. (This reference was to a lot she had bought for herself on which to build a residence.) I want so much to make an investment for you. I want to look well, so that you will find no room for disappointment;" and after stating a Mr. Going's estimate of property on 1st Avenue, she asks, "Would you like to join me in such a purchase, or would you prefer going alone?" The complainant swears he wrote consenting to the purchase on joint account, but the letter was not produced by defendant, and she denies having received it. However, eighteen days after the last letter was written, on the 14th May, 1883, she wrote again in reference to the same matter: "I have been looking around for some time to see what could be done by way of investment. I have decided upon a 1st Ave. lot. It lies on the corner of 21st Street and 1st Ave. It extends from 1st Ave. to Morris Ave. 182 feet with 50 feet front,—$5,000 cash, with $1,250 cash, and three years with 8 per cent. This is the very best that can be done at this time. This lot is offered by the Elyton Land Co. * * * I consider you a partner in the transaction today. I will give the Elyton Land Co. a draft on you for the money (and this she afterwards did for $1,250,

and he paid it). Raise it in any way you think best. The bonds will have to go. Let me hear from you immediately." The complainant says he replied, consenting to the joint purchase, which letter was not produced, and she denies having received it also. She states that it was not until in 1891, when, on an attempted settlement with her brother, she was showing him that he was largely indebted to her, he for the first time made a claim to an interest in the property; but, how correct this is, we shall presently see. We have seen the correspondence between the parties, at the time of the purchase and prior thereto, indicating clearly an understanding between them, touching the purchase of this property.

On the 10th January, 1890, more than six years after the purchase, she wrote to complainant, "Today I have, after much hard work on the part of the agent, sold 25x 100 feet on corner of 1st Ave. and 21st Street, at $850 per foot. I tried awful hard to get $900 per foot, but couldn't get it, because some others are holding their property so low. The Steiners (Jew Bankers) bought it. I shall have everything done right. Col. Brown will assist me, and he is very correct in business matters. * * * * I hope you will be pleased. I would have written, if I had had time, but a man was urging another lot, and if we did anything, it had to be done at once."

On the 22d of the same month she writes to him again, explaining why she had not written earlier, and in the letter she said: "On the next page I will give you a statement of the sale. It may astonish you, but I have done the best I could, with such a family on my hands." Then follows the statement, showing the purchase price, from which she deducted the sum of $15,220.76, the amount of a mortgage indebtedness she had placed on the property, and fees, leaving in her hands only the sum of $6,012.17. Of this mortgage, the complainant says he had never been informed, although it was recorded, and there is no evidence to show that he had been. He knew that they owed a balance on the purchase to the Elyton Land Company, amounting with interest to about $5,000, which would have to be paid, but he was surprised, that defendant had applied so great a part of the purchase money to her individual

debts. He wrote to her to send him the $6,000. Defendant says, out of the money raised on this mortgage, she paid the balance of about $5,000, to the Elyton Land Co., the balance due on the First Avenue lot. To this letter she replied on Feb'y 10th, following, seemingly apologizing for not having replied earlier, and also for having appropriated so large a share of his interest in the money to her individual uses. She said, "If you remember, I had to borrow money as far back as '84 and '85, to make payments on lots. When I sold 2nd Ave. lot, I had to pay out the 3rd Ave. lot. So little had been paid on it, it did not much exceed the interest. When I built my house, I had to borrow about $4,000. Then I had to settle up with the Elyton Land Co. in some way. I could not promise to make semi-annual payments, and you could not, so I had no alternative but to borrow money at a big rate and pay out the 1st Ave. lot * * * * I can't see how I shall get along without any money, so if you can make out with $5,000 I will remit that to you at any time." On the 19th of the month following she did remit to him. The only explanation she gives of this payment, when confronted by it as evidence of her acknowledgment of his interest in the property, is that complainant called on her for some money, and, as she had always been in the habit of letting him have money since he commenced attending to her business, she sent him $5,000, thinking she was indebted to him to some extent, but not to that amount. This explanation is unnatural and cannot be accepted. The conclusion is irresistible from the evidence, that she made him this remittance on account of the money coming to him from the sale of the lot, and an acknowledgment of the performance by him of all that entitled him to it. This is all the more so, when we have before us her letters, running through a period of six years and more after the purchase of the lot, in which in a great many of them she unequivocally recognizes and treats him as a co-owner with her in the property, speaking of it as our lot, your interest in the property, and such like expressions, and advising with him whether they should sell at this, that or the other price, as the property continued to enhance in its selling price. Extracts to this effect from these

letters are so numerous, that it would burden this opinion to set them out. They are extracted and collated at great length in brief of counsel for appellant. On one occasion it may be added, as showing that she conceded his interest to be one half, in referring to the sale of another lot she says, "If the Going lot sells for $1,400 of this you would have $700 more or less * * * This would meet the next payment on the 1st Ave. lot, but as you remember I did not meet my half of the first payment, so it must with interest be about $1,000."

If more were needed as to his interest in the property, it is found in the deposition of Mrs. Horton, a sister of defendant, who deposed, "Before the trouble between my sister and my brother, I had several conversations with her in which she admitted that he had an interest in her Birmingham property, and particularly in the lot at the corner of First Avenue and Twenty-first Street, and also, the Third Avenue property. I understood from her statements, in these conversations that his interest in the property was a half interest."

When it comes to the proof, as to what each paid, it is unnecessary to review it at length, since it is very voluminous. It clearly and satisfactorily appears, that he paid from the beginning his half of such payments as were made, if not more, and that the last payment of $5,000 was made by defendant without his knowledge, with money she states she raised by mortgage on the property. This payment as we have said enured to his benefit as well as to hers.

The complainant is clearly entitled to his undivided half interest in the proceeds arising from the sale of said property, which are held by defendant in trust for him, and has a lien thereon, and to a personal decree against her for the same, as the amount may, on a reference be ascertained. He is also entitled to one half of the decree obtained by defendant against the Mayor and Aldermen of Birmingham in his own right; and the same having arisen out of the property held in trust for complainant by defendant, he is entitled also to the other half thereof, and the same should be decreed to be paid to him, if necessary, and to the extent it may be found necessary for the payment of the amount due to com-

plainant by defendant on account of said property, as may be ascertained on settlement of the account. But, it appears by agreement of parties filed in the cause, that if a decree shall be rendered ascertaining that complain-ant is entitled to the proceeds of said decree against the Mayor and Aldermen of Birmingham, then the decree in this case shall provide and declare that S. W. John, the solicitor who procured said decree to be rendered, is entitled to a first lien on said decree or the proceeds thereof, for his services in said cause, for the sum of $750, the sum agreed on as compensation to him. The decree of the court below to be rendered, should first deduct this sum from the amount of said decree against Birmingham, and order the same when collected to be paid to said John, and the balance thereafter appropriated, according to directions above specified.

The defendant Wm. Spencer, made claim to this decree by setting up in his answer that the same had been transferred to him for a valuable consideration by the said defendant, prior to the institution of this suit. He has, however, made no attempt to establish his claim and disappeared from the case after filing his answer. His claim, therefore, does not stand in the way of complainant's assertion of his rights in said decree.

It is conceded by appellant, that it is unnecessary for the court to pass upon the validity of the transactions between defendant and J. H. Brown as to the other part of said First Avenue property not sold to Steiner Brothers, and which constitutes the second branch of this case. Brown is dead, his estate insolvent, and the property is not worth the incumbrances to *bona fide* purchasers he placed on it. The opinion and decree herein rendered are confined to that part of the cause which relates to the purchase and sale of the part of said property which was sold to said Steiner Brothers. It may be stated, however, for the bearing it has on the other branch of the case we have been considering, that defendant, without the knowledge of complainant, sold that part of the lot to said J. H. Brown, for some $22,500, and with his assistance, so managed, that complainant never received a dollar of his share of the money.

The garnishment of the American National Bank

against the Mayor and Aldermen of Birmingham is void, and the injunction against the prosecution of its garnishment suit should be made perpetual. Municipal corporations are not the subjects of garnishment in this State. They are held not to be subject to this process, unless, on grounds of public policy, they are included in unequivocal terms by the letter of the statute. Our statute does not include them.—*Porter v. Perdue,* 105 Ala. 293.

The cross-bill of defendant is without equity and should be dismissed.

A decree will be here entered reversing the decree of the court below, and declaring the complainant entitled to one half of the proceeds of the lot in question which was sold by defendant Fannie A. Steele to Burghard and Sigfried Steiner, after deducting therefrom the sum remaining due to the Elyton Land Company for the purchase of said lot, paid to said company by defendant out of the proceeds of sale. It is further ordered that the register of said court proceed without delay, under the rules of the court applicable in such cases, to ascertain and report how much is due to complainant by the said Fannie A. Steele on account of the excess of payments made on the purchase price of said lot by complainant, over and above what was paid thereon by the said Fannie A. Steele, and also what is due to complainant on account of the amount received by the said Fannie A. Steele for the sale of said lot to Burghard and Sigfried Steiner. He will make report herein to the next term of said chancery court of said county of Jefferson, for decree thereon, and for decree in the case, in conformity to the principles of the foregoing opinion of this court.

Reversed, rendered and remanded.