(125 So. 228)
## DE FREESE et al. v. VANDERFORD et ux. (7 Div. 897.)

Supreme Court of Alabama.   Oct. 24, 1929.

Rehearing Denied Dec. 19, 1929.

Merrill & Jones, of Anniston, for appellants.

S. W. Tate, of Anniston, for appellees.

THOMAS, J. The final decree denied relief on the respective theories of the bill—that fraudulent dominance or undue influence was exercised (Cox·v. Hale, 217 Ala. 46, 49, 114 So. 465); or that a resulting trust existed. It will not be necessary that the recognized distinctions between implications of a resulting trust and the legal presumptions of an implied or constructive trust be here considered. Rudulph v. Burgin, 219 Ala. 461, 122 So. 432; Hill v. Hill, 216 Ala. 435, 113 So. 306; Montgomery v. McNutt, 214 Ala. 692, 108 So. 752; Blanks v. Atkins, 217 Ala. 597, 117 So. 193; Sanders v. Steele, 124 Ala. 415, 417, 26 So. 882; Bailey v. Irwin, 72 Ala. 505; Patton v. Beecher, 62 Ala. 579.

It is sufficient to say there were conflicting tendencies of evidence that were resolved by the trial court, after seeing the witnesses and hearing their evidence given ore tenus. Hackett v. Cash, 196 Ala. 403, 72 So. 52; Hodge v. Joy, 207 Ala. 198, 92 So. 171; Andrews v. Grey, 199 Ala. 152, 74 So. 62. And his holding supported the view that, after the death of grantor's wife, he sold the farms owned by them, one for $4,900, and gave $700 or $750 to each of his children, and invested $3,000 in the home which he conveyed to respondent. It was not unreasonable that he should have given his children the amount, or a sum in excess thereof, for which his wife's interest in the farm was sold, and retained the balance for his shelter, support, and maintenance during his last, lingering days of sickness unto death.

All of the evidence (except that of Dr. Kinnabrew) was taken in open court, and we will not disturb the result of the decree, whatever the theory on which the trial was had. The witnesses, who were not parties in interest, say the father and grantor was a man of strong or decided conviction, not easily persuaded, knew and understood the natural objects of his affection and the usual claims of the ties of blood or relation, was conscious, or not under the dominance of mental disorder, when the deed was made on August 4, 1924, about 14 days before his death. The proof tends to show the other children were better provided for by their material or worldly goods than was Mrs. Vanderford, and that the latter and her husband spent many months in the personal and necessary ministrations for the sick father.

The complainants did not testify that the father was not capable of making the deed when he did, and there was ample evidence, or reasonable inferences therefrom, that these appellants participated in the transaction of the sale of the farm, and thereby intended it as a gift to the father, or as repayment for the several sums of $700 or $750 he gave them when former sale was consummated. If the money paid for the last tract

362

of real estate was that of the father, then no trust in the land could result in favor of his children, whatever be the alleged parol promise. However, the question of fact as to such alleged parol promise of Mr. De Freese to purchase other lands with the proceeds of the first sale, or with a part thereof, for the benefit of complainants, is controverted.

In view of the natural dominance usually or prima facie presumed to be exercised by 'a parent over the child, the latter is not required to prove the fairness of a conveyance or gift by the parent; that is, unless the evidence of surrounding circumstances overcomes the presumption of the dominance of the parent over the child. Gibbons v. Gibbons, 205 Ala. 636, 88 So. 833.

It will serve no good purpose to discuss the evidence in detail. The usual presumptions of dominance of the parent are not overcome by the circumstances of his continued illness and the natural services and ministrations of the child, without undue influence or dominating power or control of that child when the deed was made. The decree is affirmed.

Affirmed.

SAYRE, BROWN, and FOSTER, JJ., concur.

On Rehearing.

THOMAS, J. The averments of the bill as to the trust are that it was *"agreed between the complainants and the respondents* and the said R. P. De Freese that the said lands formerly owned by Venila L. De Freese should *be sold by all* of said parties joining in said conveyance, and that a part, if not all, of the proceeds of the sale of said lands should be invested in another home for the said R. P. De Freese in the city of Piedmont, Ala., and that title should be taken in the name of R. P. De Freese, who should own, occupy and enjoy said home during his lifetime, and after his death it should become the property of the complainants and the respondent Vashti Vanderford." It is further averred:

"That carrying out and in pursuance of said agreement the said property formerly owned by Venila L. De Freese was sold by the said R. P. De Freese, and the heirs of the said Venila L. De Freese, at and for the sum of $5,000; that there was purchased with $3,000 of the proceeds of said sale from L. J. De Freese, one of the complainants, the following described property, to wit: * * * That said lot was conveyed by the said L. J. De Freese to the said R. P. De Freese under the understanding and agreement between all the heirs of the said R. P. De Freese and the said Venila L. De Freese, that the said R. P. De Freese should hold title to said lot during his lifetime, and that at his death it should become the property of his said heirs. That the said R. P. De Freese should use, have, and own a life estate in said last above described property, but that at his death it should become the property of his said heirs. That the remainder of the purchase money of $2,000 for the property formerly belonging to the said Venila L. De Freese was to be used by the said R. P. De Freese for his support and maintenance during his lifetime, and after his death the balance, if any, remaining on hand should become the property of said heirs."

The express trust averred in said paragraph 4 is denied by respondents, and it is averred:

"They deny the allegations of Section Four of the bill of complaint, but they say the truth of the matter is, that the complainants and respondents and R. P. De Freese, deceased, agreed to sell the land belonging to Venila L. De Freese and they should all join in the conveyance, but they say the proceeds of said sale was agreed by the parties to become the property of R. P. De Freese, deceased, and that the said R. P. De Freese should enjoy and own the same absolutely; and there was no agreement that it should become the property of any one else, or the complainants. or the respondent, Vashti Vanderford, after the death of R. P. De Freese. It is admitted by the respondents that the property described in section 4 was bought with a portion of the proceeds for which lands formerly owned by Venila L. De Freese were sold, but they deny there was any understanding or agreement between the heirs of R. P. De Freese and Venila L. De Freese that the said R. P. De Freese should hold title to the said land during his lifetime, and at his death, should become the property of his said heirs. It is further denied that, by agreement or otherwise, the property described in section 4 of the bill of complaint should go to R. P. De Freese, deceased, to have and to hold a life estate in said property, and at his death, it should become the property of his heirs. They further deny that $2,000, or any other portion of the purchase money for which the lands formerly belonging to the said Venila L. De Freese were sold, should be turned over to the said R. P. De Freese for his support and maintenance during his lifetime, and the balance, if any, should become the property of his said heirs; that said property was turned over to him to be absolutely his."

It is further averred:

"The fact is that R. P. De Freese had owned some real estate, and that the complainants visited R. P. De Freese and the respondents some time before the death of R. P. De Freese, and that R. P. De Freese then told each of them that he had sold his own farm and that he had the money for it, and that he was going to pay them for their share in their mother's farm, the said Venila L. De Freese, the sum of $750 each, and he paid to each of them $750 each, except the complainant, Hat-

tie Wakefield. He gave to her Liberty Bonds, War Savings Stamps, and cash, all amounting to $750. All of the complainants and the respondent, Vashti Vanderford, agreed that on the payment of the $750 to each of them, that the said R. P. De Freese was to have the title to all of the lands of Venila L. De Freese, deceased, and after this agreement, the complainants each signed the deed to the lands of the estate of Venila L. De Freese, deceased, and agreed that the proceeds from said sale should be the property of R. P. De Freese, deceased, absolutely."

The amended bill sets up an implied trust as follows:

"That said property was conveyed by said L. J. De Freese with full knowledge of said R. P. De Freese and of complainants and respondents that the full purchase price of same was paid out of the proceeds of the sale of the property belonging to said complainants and respondent Vashti Vanderford, as above set out; that this was done under the general understanding and agreement as above set out in paragraph 4; that said R. P. De Freese was to have only a life estate in said property, and the remainder to revert to the joint owners of the purchase price, which was paid for same."

And respondents refile the answer to the amended bill of complaint, to which we have adverted. It was declared in Rudulph v. Burgin, 219 Ala. 461, 122 So. 432, 434:

" 'There is a wealth of decisions on the subject involved. "The clear result of all the cases, without a single exception," says Judge Story, "is that the trust of the legal estate * * * results to the man who advanced the purchase money. This is a general proposition, supported by all the cases, and there is nothing to contradict it." 3 Story's Eq. (14th Ed.) § 1597.' * * *

" 'The principle "has its origin in the natural presumption, in the absence of all rebutting circumstances, that he who supplies the money means the purchase for his own benefit, rather than for that of another, and that the conveyance in the name of the latter is a matter of convenience and arrangement between the parties for some collateral purpose." &c.' " Pom. Eq. Jur. (4th Ed.) § 1041, note (b).

If the circumstances raise the implication of a resulting trust, the fact that there was an express parol agreement for a trust will not alter the presumption of the implied trust. Liles, Eq. Juris. p. 59. The difference in the two classes of trust is that of the nature of the proof to establish.

We do not think it necessary to set out the evidence at length.

Dr. Sparks, a brother-in-law of the parties and of one of the complainants, as a witness, testified he did not know "a thing in the world about Mr. De Freese's business affairs," did not "discuss it with him," and did not "know a thing in the world about them." This witness was, no doubt, speaking of the general business affairs of Mr. De Freese, for later he was re-examined, and was more specific as to the matter before us, and gave evidence susceptible of adverse inference by the trial court.

Mr. Cheatwood, the purchaser of the home place of R. P. De Freese and wife, stated "that he paid as consideration $5,000—$3,000 cash to Mr. R. P. De Freese and the balance or a part thereof be paid to complainant. Leon De Freese, and one of the notes was paid [to Leon] after the death of R. P. De Freese"; that at the time of purchase it was agreed that R. P. De Freese and "his sons and daughters, and his in-laws" would execute the conveyance, and they so executed; that he paid the money to Mr. R. P. De Freese, who "counted it each time." This witness gave no evidence that tended to fix or infer a trust in the proceeds of that sale.

The complainant L. J. De Freese, of Piedmont, as a witness, told how R. P. De Freese was "formerly living on the property in which [his] your father had a life estate"; that it was sold to Cheatwood for the consideration indicated. He was asked: "Was there any agreement that this money that was derived from the sale of the farm, out there was to become the property of your father?" To which he answered: "Yes, sir." In this there is adverse inference to further statements of that witness as to a trust or "agreement between the heirs." Jones v. Bell, 201 Ala. 336, 77 So. 998. After some objection by counsel, witness was asked, and answered:

"A. There was an agreement between the heirs that this property be sold. The farm sold and a town house bought for my father. He was to have a life estate in it.

"Q. Was that the only agreement that the heirs had with your father about it? A. Yes, sir; that is the only agreement we had with him about it. * * *

"Q. With the understanding and agreement that he would have the same interest in it that he had in the money? A. That he had in the farm; yes, sir. * * *

"Q. What was done with the other $2,000 that was derived from the sale of the property up there that belonged to the children? * * * A. Well, I couldn't tell about all of it. I know where part of it went.

"Q. Did you have any agreement with your father about it? A. Nothing more than the balance of the place. Any part he didn't use would be ours.

"Q. You all agreed that he might use it as he saw fit to use it for? A. Yes, sir."

The general statement of that witness and his understanding was that the father might use it as he saw fit, and this was what "all

agreed." He sold and conveyed the Piedmont place to the father.

Mr. E. F. De Freese, of Atlanta, Ga., as a witness, gives his version of the agreement, as to the proceeds of the sale, as: "This money was turned over to my father to use," referring to consideration for the conveyance to Cheatwood, the $5,000. The witness was asked: "What did you say to him about it? What did you do with that money?" To which he answered: "Well, it was an arrangement to get him to move from the old home place. He was strong for staying there. He was getting so feeble. We were all so far away, and it was inconvenient for him to get there, and we promised him he could use the money from the proceeds of that place for a home the rest of his life, and he was to take the money received from the farm and buy him a home in Piedmont. An agreement of that kind was made as an inducement to him to come where we could see him more often." That complainant being asked, "What I want you to explain is whether or not he was to have a life estate in it?" answered: "That was the only agreement; that he was to continue with that as he had in the old home place; the same interest as in the old home place that was being sold." He was then asked: "Why was the deed taken in his name?" To which he answered:

"I don't know that I could answer that. Nothing more than just for his satisfaction, for an old crippled man in life to know that he wasn't dependent upon some one else for his livelihood.

"Q. You don't know anything about the agreement why it was taken in his name? A. I don't know. I couldn't answer that because I don't know that."

In this there was ground for adverse inference as to the exact nature of the "agreement" or "arrangement" among or by the children, and whether it amounted to more than a "promise" or implication thereof, or a trust that affected the title of the parent to the land so purchased and conveyed to him by a child or children. A conclusion of that witness was, "nothing more than just satisfaction" to an old crippled man to know that he was not dependent upon any one. That witness stated that the father owned a place "that was sold a short time *after* your [his] mother's place was sold," and that the father gave him $500 from the proceeds of such sale. The witness stated that the sale of the father's land was two or three years before the sale of the mother's land, and there was no agreement to reimburse the father by sale of the wife's land, for the sums of money he had given the children, the proceeds of the sale of the father's land.

Mr. L. J. De Freese, recalled and cross-examined, said that Mrs. Wakefield was appointed administrator, and witness had so acted in that capacity until the time of her appointment; that his father and mother owned the place first sold; that it was his father who purchased of his grandfather, and he did not know how the deed was made, and the father paid him $750 from the proceeds of that sale; that he borrowed $250 from his father at or after the time witness was out of the hospital; he did not personally handle the transaction of the loan from his father to him.

Mrs. Wakefield testified, among other things, that she lived with the father from 1905 to 1915, when respondent came there; that the mother requested "on her deathbed" (in 1905) that she "look after these children," and she did so; frequently visited the father at Piedmont; she did not think him competent to do any business for three months before his death; the father did not talk about his business unless you asked him; "did his own thinking" and "his own acting"; gave her Liberty Bonds and War Saving Stamps of the value of $700; that Mrs. Vanderford, a respondent, lived with and cared for the father from 1915 until his death in 1924. Said complainant, being later re-examined, stated that the father had no conversation with her before he sold the first farm; had no agreement to buy her interest in the place sold to Cheatwood; and being asked, "What was the agreement about the Cheatwood place?" replied:

"A. There wasn't any agreement that I know of. My father wanted to live in the house all the time, and it belonged to the children, and we wanted him to move to Piedmont. We did the agreeing. There was no agreeing with father, or anything to it. We children just agreed to sell that place and buy a home for father to live in, in Piedmont, as long as he wanted it.

"Q. Did you give him the money, or did you— A. We just let him have it as long as he lived. He said: 'It will all go back to you anyway. I won't be here long.'

"Q. You had that agreement with him? A. Yes, sir.

"Q. Where did you have this agreement about this place would be sold? A. We just talked it over among ourselves, when we would see each other.

"Q. You talked it over with your brothers? A. Yes, sir."

And, being cross-examined, Mrs. Wakefield stated that they talked it over with the father; did not know who was present; could not tell when the places were sold; that the father's place was sold first; could not tell whether he gave her the money before or after the mother's place was sold; believed it was before, "about a year or something like that;" said there were five girls and two boys; that "they never did all get the same amount; Father was to make it all the same, but he never did"; that she "supposed she got

about one-seventh of what her mother's place brought," and it was her best recollection that this payment to her was about a year before the mother's place sold.

At this point in the evidence, respondent Mrs. Vanderford testified as to this:

"Q. You knew that the children did have an interest in the property, didn't you? A. I knew that they had an interest in the home over there, but he had paid them for it.

"Q. He had paid them for it? A. Yes, sir; he gave them all the money he had.

"Q. When was it he paid them for it? A. When he sold the farm.

"Q. Didn't make—did they make him a deed for the home? A. No, sir; didn't do that.

"Q. How was it he deeded that? A. He just told them that was what it was for.

"Q. And yet he never did take a deed for it? A. No, sir; I don't know why he didn't.

"Q. He gave you some, too, didn't he? A. Yes, sir.

"Q. How much did he give you? A. $700.

"Q. How long did you all live on that farm? A. Seven years I think.

"Q. Your husband farmed there, didn't he? A. Yes, sir.

"Q. You didn't pay any rent? A. No, sir; he didn't require any.

"Q. Your father gave you some money occasionally, didn't he? A. Yes, sir; he gave me some along.  *  *  *

"Q. And did he give the others, so far as you know, that same amount? Is that your understanding? A. Yes, sir.

"Q. What did he give you this money for, this $700, or whatever was given to you? A. It was to buy this farm of mother's, or whatever we was interested in.

"Q. What was the understanding about what was to—what would become of this farm? A. He never really had any understanding, except he told them that was to be his farm. He was paying for it.

"Q. So you all accepted it under those conditions? A. Yes, sir."

Dr. Sparks testified of the efforts to move the father to Piedmont as follows:

"I asked him to move to town. He was in very poor health, and a good way from his children, and he said he had no way of supporting himself, except the farm, and I told him I thought all the children would be agreeable to his moving to town, and selling the farm, and using the money as he pleased. He said it wouldn't make any difference; what he left the children would get anyhow.

"Did he tell you afterwards that he had made the agreement with the children? A. Yes, sir."

Mr. L. J. De Freese further testified the father said, when he gave him the $700, that "he had that money and had no use for it"; that "we could use it; we were all just getting started out, and he thought it would do us more good than any other time, and he would just divide it between the children"; that the children "just agreed among ourselves for him to sell the place and get a place for him to live on the balance of his life; he said, if there was anything left, it would be ours, just the same as the farm would have been, if he had held it"; that "we recognized he had a life interest in the farm"; that he and his wife sold and conveyed the Piedmont property to the father, who paid for it $3,000 in the father's check, or that of Cheatwood, he was "not sure about it"; that the consideration therefor was received (for the Piedmont place)—"came through the father's hand"; that the "agreement had been made before that"; that, when deed was made, "nothing was said about the agreement at that time"; deed was made, and he "gave it to him, and he paid for it." Witness was asked who was present when he had the agreement with him about it, to which question he replied: "There never was more than one or two of us at a time on it." The father was present, but who was present, when he (the father) was present, he could not now tell.

Mrs. Sparks testified that she had lived in Piedmont since 1915; had visited that parent frequently; admitted that respondent sister had said she had requested the father to give her the Piedmont place before the death of that parent.

We have indicated that Mrs. Vanderford further testified to the fact and manner of execution to her of the deed to the Piedmont place; that she told Mrs. Sparks that he said he was going to make the deed; she knew that the children had an "interest in the home over there, but he had paid them for it"; that he "gave them all the money he had;  *  *  * when he sold the farm,  *  *  * told them that was what it was for," and gave witness $700; and that it was her understanding that he gave a like amount to the others of her sisters and brothers; that he gave her this $700 "to buy this farm of mother's, or whatever we were interested in"; that "he never really had an understanding, except he told them that was to be his farm; he was paying for it"; and witness accepted her money "under those conditions"; was not present when he paid the money to her brother, but "was there when some of her sisters were paid"; did not see him pay Mrs. Sparks or Mrs. Wakefield.

Dr. Sparks, being recalled, further stated that the agreement, as he understood it to be, was "that he [the father] move to town, sell the place, and whatever was left they would

366

get that," and that this was agreeable to the children.

Mr. Wakefield testified that Mr. De Freese "said that whenever he died it would all go back to the children; * * * he said, when he sold the place, he would buy him a place to live in in Piedmont," and at his death it would all go back to the children anyway, or "then it will be you all's at my death." At that time he was living over the mountain; nothing was said about his owning the place that he sold to Cheatwood, or his having paid for it; he brought the deeds to me at Piedmont to sign; "said he wanted to use the money to buy a place at Piedmont to live in," and after his death "it would all go back to the children." Such were the tendencies of the evidence under the pleading we have indicated.

Mrs. Vanderford denied that such agreement was made. She was asked, and answered:

"Q. Was there ever any agreement between you and your father, or any of his sons or daughters, about selling the farm over in Choccolocco Valley and buying a house and lot, and at his death it was to go to the children, or anything of that kind? * * * A. No, sir; there was no agreement of that kind with me.

"Q. Between you and your brothers and sisters, or your father—any agreement of that kind in your presence or hearing? A. No, sir.

"Q. When was the first time you heard of that agreement? A. In the court in the trial."

The husband's evidence on this question was to like effect, and that Mr. De Freese said he wanted to buy the interest of all the children there, and the $700 paid her was Mrs. Vanderford's "part of it"; that he first heard of the complainant's claim of trust in the lands when the bill was filed.

Family settlements have been enforced by the courts in appropriate actions. Betts v. Ward, 196 Ala. 248, 72 So. 110. After all that may be said of this unfortunate family affair, the father handed over to the children the sums indicated of the proceeds of the sale of his farm, and they later executed a conveyance with him of the wife and mother's farm. This accomplished his removal from the country to Piedmont. Cheatwood said he paid in money and Mr. De Freese counted it. The testimony shows he did business with the bank, and purchased from one of the sons, or the latter sold to him, the house and lot made the subject of this suit. The remainder of the purchase price from Cheatwood was given the father by the children for his maintenance during his declining days.

There appears to have been no remonstrance on the part of his children, or any one of them, as to the sale of the father's lands,

and to the distribution or advancement indicated as made by him to the children; there was acquiescence on the part of the children, and participation in the sale of the mother's place, in which the father had a life estate. There was no objection or remonstrance during his life as to the purchase by and conveyance to him of the home in Piedmont, from or by one of the children; and as to this secrecy, lack of knowledge, no objection is shown; nor was to the paying over to him and its use by him as his own of the balance of the purchase price from Cheatwood.

When the whole record is considered, we are still of the opinion, as no doubt was the trial court, that the effort of the children, acting for themselves and others in the premises, was to remove the parent to the more accessible point at Piedmont, and make him independent and free from want. He had dealt generously with them, by distribution to them of like amounts. The first money was that of the father, and was a gift to the children. To remove him from the country to Piedmont required the sale of the mother's place, in which he had a life estate. The deed was made to him by one of the complainants, and with the knowledge of all, and the delivery to him of the balance of that purchase money was (we think, under the evidence) a gift to that parent of the remainder interest of the children. It was so treated as to the balance of purchase money.

The parent's version of the whole matter is silenced by death. The acquiescence or silence of the children, after the deed was made by one of them to the parent, is supported by the verbal act of the parent in its conveyance to the daughter, who had so long served him faithfully, and supports the decree. And it was in accord with the natural justice of the case, and inferences from the evidence, that the land during the father's life was treated as his own. They should have objected while he was in life, and required the deed changed. His declarations or promises to the child or children that they would have it after his death, when the whole evidence is considered, did not raise the implication or creation of a trust in the land in favor of the other children. The acts of the father in consumption of the moneys for his private purposes, and in the conveyance of the land, are his declarations of the capacity in which he received and held. It is not shown that he had not other moneys.

We will not disturb the decree of the lower court, and, in so doing, do not understand that on the instant facts we have departed from Hill v. Hill, 216 Ala. 435, 113 So. 306, or Montgomery v. McNutt, 214 Ala. 692, 108 So. 752. We cannot from this evidence, say that complainants have overcome the presumption that a gift was intended to the father, after he had dealt most liberally with the children, notwithstanding his advanced age and ap-

proaching infirmities, that overcame him a year or so later. 3 Pom. Eq. Jur. § 1041; 1 Perry on Trusts (5th Ed.) § 146. It was a question of pure intention. The father expressed his in the sale and gift; the children expressed theirs in the receipt of moneys, the sale of the remaining land, and removal of the parent, the deed to him of the new home, a fact known to all. The father then expressed his intention, by receipt of the deed in his name to the new home, the use of the balance of the money, and his conveyance of the Piedmont home to the daughter, who needed it and had long administered to his necessities. He who is silent when he should speak shall be debarred from speaking when conscience requires his silence. McIntosh v. Hill, 212 Ala. 136, 102 So. 101; Ivy v. Hood, 202 Ala. 121, 79 So. 587. Complainants allowed the father to believe or deal with the property as his own; his solemn acts in relation thereto will not be disturbed on the testimony before us, after his death, by those who invested him with title, or who were fully informed that the title to the fee was in the father, and acquiesced therein for many months.

The decree of the trial court should not be disturbed.

Application overruled.

SAYRE, BROWN, and FOSTER, JJ., concur.