Before his death, James D. Abston, Sr. ("the father"), and three of his four children — James D. Abston, Jr. ("Junior"), Thomas Eddie Abston ("Eddie"), and Jimmie Faye McFadden — were the record titleholders *Page 1070 
of a parcel of real property in Washington County. After the father died in 2003, the coexecutors of his estate sold the property. From that sale, the estate received $136,978.76, representing the value of the father's undivided one-fourth interest in the property.
On November 24, 2004, D. Larry Abston ("Larry"), the father's child whose name was not on the deed to the Washington County property, filed a complaint seeking a judgment declaring that the proceeds of the sale of the property should be distributed to him rather than to the creditors of the estate because, he claimed, he was the beneficiary of a resulting trust. The estate answered, denying that Larry had any claim to the proceeds of the sale. First United Security Bank ("the Bank"), a creditor of the estate, moved to intervene; the trial court granted the Bank's motion.
The Bank propounded interrogatories and requests for production of documents, seeking the basis for Larry's claim. In response, Larry produced a document entitled "Notice of Federal Tax Lien"; an agreement between the coexecutors of the estate to allow the sale of the Washington County property; correspondence relating to the sale of the property; and an untitled, unsworn document signed by Larry's brothers, Junior and Eddie, stating that their father was the trustee of a one-quarter interest in the property and that Larry was the beneficiary of the trust and, thus, the equitable owner of a one-quarter interest in the property.
The Bank moved for a summary judgment, attaching to its motion the documents it had obtained from Larry in discovery. The estate joined the Bank's motion. In opposition to the motion, Larry submitted his own affidavit as well as other documentary materials. The trial court entered a summary judgment in favor of the estate and the Bank, concluding that Larry's submissions in opposition to the motion had failed to establish the elements of a resulting trust. Larry timely appealed to the Alabama Supreme Court. The supreme court transferred the appeal to this court, pursuant to § 12-2-7(6), Ala. Code 1975.
Appellate review of a summary judgment is de novo. Ex parteBallew, 771 So.2d 1040 (Ala. 2000). A motion for a summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. A party moving for a summary judgment must make a prima facie showing "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Rule 56(c)(3);see Lee v. City of Gadsden, 592 So.2d 1036, 1038
(Ala. 1992). If the movant meets this burden, "the burden then shifts to the nonmovant to rebut the movant's prima facie showing by `substantial evidence.'" Lee,592 So.2d at 1038 (footnote omitted). "[Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life AssuranceCo. of Fla., 547 So.2d 870, 871 (Ala. 1989); see
Ala. Code 1975, § 12-21-12(d).
Section 35-4-255, Ala. Code 1975, provides:
 "No trust concerning lands, except such as results by implication or construction of law, or which may be transferred or extinguished by operation of law, can be created, unless by instrument in writing, signed by the party creating or declaring the same, or his agent or attorney lawfully authorized thereto in writing."
"It is well understood that a resulting trust arises by operation of law, in favor of him who advances the purchase money for *Page 1071 
land, though the title be taken in the name of another."Sanders v. Steele, 124 Ala. 415, 418, 26 So. 882, 885
(1899). "A resulting trust is a creature of equity, based on the presumption that he who furnishes the consideration for the purchase of lands intends the purchase for his own benefit."Leonard v. Duncan, 245 Ala. 320, 322, 16 So.2d 879, 881
(1944). A trust "arising as the result of a conveyance of property to one person on a consideration from another, [is] commonly referred to as a purchase-money resulting trust."McClellan v. Pennington, 895 So.2d 892, 896 (Ala. 2004). "Persons seeking to establish a resulting trust in land must not only show that the consideration moved from them, but that it was paid contemporaneous with the purchase of the land."Gandy v. Hagler, 245 Ala. 167, 171, 16 So.2d 305, 308
(1944). "`It is settled that the purchase price must be ordinarily furnished by one claiming a resulting trust at the very time of passage of title. The trust either arises at that very time, or it never arises at all. Subsequent contributions do not suffice. . . .'" Shirley v. McNeal,274 Ala. 82, 85, 145 So.2d 415, 417 (1962) (quoting the trial court's order).
In opposition to the Bank's summary-judgment motion, Larry submitted, among other things, his own affidavit. The affidavit states:
 "My name is Larry Abston. I am the plaintiff in this case and a son of James D. Abston, Sr., who is now deceased. Sometime prior to April of 199h Abston Services, Inc. agreed to distribute to me and my three siblings an amount sufficient to purchase a parcel of property in Washington County, Alabama, as described in the original complaint. Title to three-fourths of the property was taken in the names of my three siblings. Title to my one-fourth interest in the property was taken in the name of my father . . . in trust for my benefit. At the time of the purchase, an Internal Revenue Service ('IRS') tax lien had been filed against me. I disputed this lien and had taken action to have it released[;] however, we all (my three siblings, my father and I) agreed that it would be better for all involved if my father took title on my behalf after I had paid or caused to be paid my portion of the purchase price. This would prevent the IRS from filing a lien on the property while I continued to work on having the lien released. At no time were we trying to defraud the IRS; we just didn't want my dispute with the IRS to have any negative effect on my siblings' ownership of the property. It was understood that the trust would terminate at such time as the lien was released. The lien was eventually released; however, title was not conveyed to me by the Trustee before he passed away, because neither one of us knew the lien had been released. The property was sold in 2004 and the trust corpus was converted into personalty, i.e., $136,978.76, which is now being held in . . . the trust account [of the attorney for the estate]. I executed a quitclaim deed conveying my interest to the purchaser. On November 15, 2004, my two brothers, [Junior and Eddie], executed a document which acknowledged that this property had been held in trust by my father for my benefit. A copy of this document is attached hereto and marked Exhibit A to this affidavit.
 "Besides having paid or caused to be paid my portion of the purchase price for the property, I also went into possession of the property and provided substantial `sweat equity' in the form of building approximately 4 miles of roads, clearing of 5 fields, construction of a bridge over Sinabogue Creek, construction of approximately 3 miles of 4-wheeler trails, building 5 shooting houses, etc. I worked on our property for *Page 1072 
about two months. In all respects I was treated as a joint owner of the property. Along with my wife and children, I hunted on the property, used the camp house, took guests on the property, had keys to the gate, and had all privileges of an owner, privileges that had been discussed and agreed on by each of us (my siblings) as joint owners.
 "My father and I never prepared a formal, written trust agreement. Since everything had been discussed and agreed to by each of us, since everyone knew that my interest in the property was being held by my father in trust, for my benefit, we didn't think a formal written trust agreement was necessary to protect my interest. Obviously, this was a mistake; however it shouldn't deprive me of my ownership of the funds being held in . . . the trust account [of the attorney for the estate]."
(Emphasis added.)
 I.
The Bank and the estate argue that the following statement in Larry's affidavit is not substantial evidence of Larry's payment of the purchase price of the Washington County property: "Sometime prior to April of 1994, Abston Services, Inc. agreed to distribute to me and my three siblings an amount sufficient to purchase a parcel of property in Washington County, Alabama." The Bank and the estate contend that the foregoing statement is a mere conclusion because, they say, the statement is unsupported by any "cancelled checks, board resolutions, tax returns, Form 1099's, memos, [or] letters."
The Bank and the estate misapprehend the material fact sought to be proved. The source of the funds — a distribution from Abston Services, Inc. — that Larry allegedly used to pay for his portion of the purchase price of the Washington County property is immaterial for purposes of determining whether Larry established the elements of a resulting trust. The relevant material fact is whether
— not how — Larry paid his portion of the purchase price at the time of the passage of title. SeeShirley v. Neal, 274 Ala. at 85, 145 So.2d at 417.
The trial court erred in determining that Larry "failed to produce any substantial admissible evidence that he provided funds to the decedent to purchase an interest in the subject real property." The statement in Larry's affidavit that he had"paid or caused to be paid [his] portion of the purchase price for the property" constitutes substantial evidence of Larry's payment. See, e.g., First State Bank ofAltoona v. Barnes, 496 So.2d 53, 54
(Ala.Civ.App. 1986) (holding that, when a secured party submitted evidence indicating that it had not received from the debtor the proceeds of a sale of equipment, the debtor's affidavit stating that he had "paid the proceeds from the sale of . . . equipment . . . to [the secured party]" created a "genuine issue of material fact" as to payment). The statement in Larry's affidavit that "we all (my three siblings, my father and I) agreed that it would be better for all involved if my fathertook title on my behalf after I had paid or caused to be paid myportion of the purchase price" constitutes substantial evidence indicating that Larry's payment was made "contemporaneous[ly] with the purchase of the land." SeeGandy v. Hagler, 245 Ala. at 171,16 So.2d at 308.
Because we hold that Larry presented substantial evidence, in his affidavit alone, of the elements of a resulting trust, we need not address the admissibility or legal effect of the other documents Larry submitted in opposition to the Bank's motion for a summary judgment. *Page 1073 
 II.
The estate argues that, even if Larry did present substantial evidence of the elements of a resulting trust, the summary judgment in favor of the estate is due to be affirmed because, it says, Larry is precluded under the doctrine of unclean hands from benefiting from the trust. Specifically, the estate contends that Larry's attempt to shield his interest in the Washington County property from an Internal Revenue Service ("IRS") tax lien constituted an attempt to defraud a creditor, which, the estate says, is unconscionable conduct that will bar the enforcement of a resulting trust. Citing Cone v.Cone, 331 So.2d 656 (Ala. 1976), the estate maintains that "`a court of equity will never imply or enforce a trust, springing out of transaction, in which the party seeking to enforce it, has been guilty of fraud or immoral conduct,'"id. at 659 (quoting Glover v. Walker,107 Ala. 540, 545, 18 So. 251, 254 (1894)).
In Cone, a husband purchased property and took title in his own name. Later, he transferred title to his wife in order to protect the property from the claims of his creditors. The supreme court held that no resulting trust could arise because "[t]he property . . . was not purchased with the funds of one party and title taken in the name of [another party]."331 So.2d at 658. "It was not until several years subsequent to his purchase that [the husband] transferred title to [the wife]. Thus, the elements of a resulting trust are not present."Id. The court continued, however, explaining in a discussion not necessary to the holding, that "any alleged resulting trust that might otherwise have arisen under the facts of this case will not be enforced," id. at 659, quoting the following principle from Bogert, Trusts andTrustees § 463 at 634-35 (2d ed.1964):
 "`[I]f A pays for land and has it conveyed by absolute deed to B, with the intent of cheating A's creditors, the court will render A no aid in securing the enforcement of the resulting trust which would normally be implied for his benefit. . . .'"
331 So.2d at 659. See also Woodard v. Funderburk,846 So.2d 363 (Ala.Civ.App. 2002).
In Woodard, this court held that a father who paid for land and placed title in his son's name could not have a resulting trust implied for his benefit because the conveyance to the son was motivated by the father's intent to avoid the claims of the Mississippi State Tax Commission, which had recovered a judgment against the father. Quoting from a more recent edition of the same authority upon which the supreme court had relied in Cone, this court stated:
 "`If the payor had the title run to another for the reason that he (the payor) desired to defeat, delay, or hinder his creditors, the case will be judged in the same way as an express trust for fraudulent purposes. Thus, if A conveyed to B in trust for A with the purpose of defrauding A's creditors, A cannot enforce the trust for himself ordinarily, but his creditors can attack the transfer and get the benefit of the property. And so, if A pays for land and has it conveyed by absolute deed to B, with the intent of evading A's creditors, the court will render A no aid in securing the enforcement of the resulting trust which would normally be implied for his benefit, but the creditors of A may take his equitable interest by resorting to the procedure required in such an instance in the particular jurisdiction.
 "`Some courts state that "no trust results" to the fraudulent payor of the consideration. It would seem more accurate to hold that a trust results, but that the beneficiary of it will not receive aid from the court in the enforcement of *Page 1074 
the trust because of his unconscionable conduct.'"
Woodard v. Funderburk, 846 So.2d at 369 (quoting George G. Bogert George T. Bogert, The Law of Trustsand Trustees § 463 at 388-91 (rev.2d ed.1991)) (emphasis omitted; emphasis added). As our emphasis on the word "ordinarily" in the above quote implies, there are exceptions to the rule that one who transfers property with the intent to avoid the claims of a creditor will not be allowed to enforce a resulting trust.
Sections 422 and 444 of the Restatement (Second) ofTrusts (1959), establish a balancing test to determine whether to enforce a resulting trust when the transferor has engaged in illegal conduct. Section 422 deals with an express trust that fails for illegality of purpose.[1] Section 444 deals with a transfer of property under circumstances like those present here, i.e., property is purchased by one person and title is taken in the name of another person in order to accomplish an illegal purpose.[2] The balancing test stated in both sections is based upon the same policy. See
Comment a., Restatement (Second) of Trusts § 444 (1959). "Whether the owner of property transfers it upon a trust which fails for illegality . . ., or whether property is purchased and title taken in the name of another to accomplish an illegal purpose, a resulting trust arises unless thecircumstances are such that it is against public policy toenforce such a resulting trust." Id. (emphasis added).
The balancing test requires a court to weigh the interests of the parties and the public interest:
 "As between the parties it is just that a resulting trust should be imposed in order to prevent the transferee from being unjustly enriched at the expense of the transferor. The interest of the public, however, may require that the transferee be permitted to enrich himself unjustly at the expense of the transferor. The result of the refusal of the court to enforce a resulting trust is not only to penalize the transferor but to enrich the transferee. This result is justified, if at all, on the ground that it tends to prevent such illegal transactions and on the ground that the public should not be burdened with the expense of adjusting claims based on illegal transactions. It is impossible to state a definite rule which will determine in all cases whether a resulting trust will be imposed or not, since the court will consider all the circumstances involved in the particular case."
Comment a., Restatement (Second) of Trusts § 422.
In Fenderson v. Fenderson, 454 Pa.Super. 412,685 A.2d 600 (1996), a case with facts very similar to those in the instant case, three siblings contributed to the purchase price of land, but title was taken in the name of only two of them because the third sibling, Bryan Fenderson, had a personal-injury lawsuit pending against him. The trial court determined that, if a resulting trust existed, it was invalid because the *Page 1075 
trust had been created to avoid the claims of Bryan's potential creditors. The appellate court reversed, holding that the resulting trust was "valid and must be enforced."454 Pa.Super. at 426, 685 A.2d at 606.
The appellate court recognized that the plaintiff in the lawsuit filed against Bryan was considered a creditor under the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa. Cons.Stat. § 5101(b), defining a creditor as "any person who has a claim [or a] right to payment regardless of whether it is reduced to judgment, liquidated, fixed, contingent, matured, unmatured or disputed." 454 Pa.Super. at 425,685 A.2d at 606.[3] The court reasoned that "it would seem as if a resulting trust [could not] arise in favor of Bryan Fenderson because he contributed to the purchase price without taking title in order to defraud a potential creditor." Id.
The court further reasoned, however, that § 444 of theRestatement (Second) of Trusts, specifically Comment a to that section, "allows a resulting trust created for an illegal purpose to arise unless it is against public policy to enforce such a resulting trust." Id. Finally, the appellate court, noting the trial court's finding that the lawsuit against Bryan Fenderson had been dismissed with prejudice, concluded:
 "[I]t is not against public policy to enforce the instant resulting trust when the filed lawsuit was dismissed without any evidence that the claim which Bryan sought to avoid had any substantial foundation. As a result, the resulting trust in favor of Bryan Fenderson is valid and must be enforced."
454 Pa.Super. at 425-26, 685 A.2d at 606. See also Palumbov. Palumbo, 55 Misc.2d 264, 284 N.Y.S.2d 884
(1967) (holding that, when a husband who had been sued by two other parties in a negligence action conveyed property to his wife in an attempt to avoid the potential creditors but the negligence action was later disposed of without a judgment against the husband, and the wife refused to reconvey the property to the husband, the wife had failed to meet her burden of proving that the potential creditor's claim had "any substance"); Thompson v. Steinkamp, 120 Mont. 475, 483,187 P.2d 1018, 1022 (1947) (using the balancing test set out in § 422 of the Restatement to impose a trust on property that the husband had paid for before he died — but had titled in the name of another in order to avoid the alimony-arrearage claims of his ex-wife — because the ex-wife had filed no claim against the husband's estate and to hold otherwise would "deprive [the current wife, the husband's widow, who was innocent of any wrongdoing] of her dower interest in the property as well as her right of inheritance").
We have previously determined that Larry's affidavit presented substantial evidence creating a question of fact as to whether Larry paid for his share of the Washington County property at the time title was taken in the name of his father and three siblings. Because Larry submitted evidence indicating that he had disputed the validity of the federal tax lien that was filed against him, that he had taken action to have the lien released, and that the lien was eventually released, we hold that his affidavit presents additional questions of fact with respect to whether Larry had a good-faith dispute with the IRS as to the validity of the lien, whether the lien had "any substantial foundation," see Fenderson,454 Pa.Super. at 425-26, 685 A.2d at 606, and whether it would violate public policy to enforce a resulting *Page 1076 
trust in favor of Larry, see Restatement (Second) ofTrusts § 444, Comment a.
The judgment of the Choctaw Circuit Court is reversed, and the cause is remanded for further proceedings.
REVERSED AND REMANDED.
THOMPSON, P.J., and PITTMAN, BRYAN, and MOORE, JJ., concur.
[1] Section 422 states:
 "Where the owner of property transfers it inter vivos upon an intended trust which fails for illegality, a resulting trust does not arise if the policy against permitting unjust enrichment of the transferee is outweighed by the policy against giving relief to a person who has entered into an illegal transaction."
[2] Section 444 states:
 "Where a transfer of property is made to one person and another pays the purchase price in order to accomplish an illegal purpose, a resulting trust does not arise if the policy against unjust enrichment of the transferee is outweighed by the policy against giving relief to a person who has entered into an illegal transaction."
[3] Like the Pennsylvania statute, the Alabama Fraudulent Transfer Act, § 8-9A-1 et seq., Ala. Code 1975, is based upon the Uniform Fraudulent Transfer Act. Section 8-9A-1(4), Ala. Code 1975, defines a creditor as "[a] person who has a claim."